**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

EDWARD AUGUSTINE                                    CIVIL ACTION

VERSUS                                                      NO. 16-1191

DARYL VANNOY, WARDEN                          SECTION: "E"(1)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Edward Augustine, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On November 28, 2012, he was convicted of the second degree murder of Aaron Williams and the attempted second degree murder of Kimberly Williams.[1] On January 4, 2013, he was sentenced on the former conviction to a term of life imprisonment without benefit of probation, parole, or suspension of sentence and on the latter conviction to a concurrent

---

[1] State Rec., Vol. 1 of 10, minute entry dated November 28, 2012.

term of thirty years imprisonment.[2]  On January 22, 2014, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[3]  The Louisiana Supreme Court then denied his related writ application on September 26, 2014.[4]

In November of 2015, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on December 2, 2015.[6]  He did not seek supervisory review of that denial.

Petitioner then filed the instant federal application seeking habeas corpus relief.[7]  The state filed a response conceding that the application is timely but arguing that petitioner's claims have no merit.[8]  Petitioner filed a reply to the state's response.[9]

### **Standards of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

---

[2] State Rec., Vol. 7 of 10, transcript of January 4, 2013; State Rec., Vol. 1 of 10, minute entry dated January 4, 2013.
[3] State v. Augustine, 133 So.3d 148 (La. App. 4th Cir. 2014); State Rec., Vol. 9 of 10.
[4] State v. Augustine, 149 So.3d 260 (La. 2014); State Rec., Vol. 9 of 10.
[5] State Rec., Vol. 10 of 10.
[6] State Rec., Vol. 10 of 10, Judgment dated December 2, 2015.
[7] Rec. Doc. 3.
[8] Rec. Doc. 15.
[9] Rec. Doc. 16.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.    AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein. White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

### Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of

this case, as adduced from the trial testimony, as follows:

> *Testimony of Merlin Williams*
> Merlin Williams testified at trial that he was the father of the decedent, Aaron Williams ("Aaron"). He testified that on 8 December 2007, he was living with his wife and Aaron at 4300 Sullen Place in New Orleans. He stated that he was in his car when he received a phone call from his wife who told him that Aaron had been shot. Mr. Williams returned home, picked up his wife, and together went to Tullis Drive where he observed his son lying on the ground bleeding. He testified

that some people who were on the scene told him who had shot his son.  Mr. Williams also stated that he knew his son was friends with Terrance Augustine ("Terrance"), the brother of the defendant.

### Testimony of Yolanda Haynes

Yolanda Haynes testified that she was a 911 operator for approximately three and a one-half years and worked in the communications department of the New Orleans Police Department ("NOPD"), answering 911 calls and writing "incident recalls."  She testified as to the authenticity of the 911 reports made on the day of the crime.

### Testimony of Charlene Smith

Charlene Smith testified that on 8 December 2007, she was returning home from work when she saw the decedent fighting with another boy.  She stated that she went into her home, an upstairs apartment, looked out of the window, and witnessed a boy holding Aaron while Aaron fought with another boy.  She testified that she yelled out of her window and instructed the other boy to let go of Aaron, but to no avail.  Ms. Smith identified a photograph of an individual that she referred to as "T" (later identified as Terrance) as the person with whom Aaron was fighting. She explained that she went downstairs, brought Aaron upstairs to her apartment, and cleaned a cut on his chin.  When Aaron left, she called 911 because Aaron was alone.  She stated that shortly thereafter she heard gunshots.  She testified that she knew Aaron and "T" from their hanging out in her area with the other boys who frequently hung out together.  She stated that "T" and Aaron were friends.

### Testimony of Sergeant Andre LeBlanc

Sergeant Andre LeBlanc[FN1] testified that he was with the NOPD for thirteen years and that on 8 December 2007, he was assigned to the NOPD's Fourth District Investigative Unit in the Property Crimes Division located in Algiers.  He stated that on that day, he responded to a dispatch call of multiple gunshots in the 5900 block of Tullis Drive.  When he arrived with his partner, Detective Kevin Bell, he observed that the scene had been secured by other officers.  A man who had been shot several times was lying on the ground.  He testified that EMS had already pronounced the man dead.  Sergeant LeBlanc, as lead investigator on the scene, stated that he immediately started talking to the people who were standing around.  He was able to speak to a lady who was willing to cooperate with him, so he transported her to the police station.  In addition to that witness, he testified that Terrance and James Green were also taken in for questioning.  The sergeant testified that he learned that Terrance had been in a fight and that it was physically apparent from his appearance.  He stated his investigation revealed that the victim had been in a fight shortly before his death and that one of the individuals involved in the fight was Terrance.  He stated that the only possible suspect he knew of from an anonymous witness went by the name of "D-Murder" and that "D-Murder" was Terrance's brother, whose real name was Damian Red.  However, through

6

investigation and talking to witnesses, including Terrance and James Green, Sergeant LeBlanc stated that he was able to positively determine that Edward was the shooter. The sergeant testified that Edward was apprehended in Colorado months after the shooting.

[FN1] At the time of the crime, Sergeant LeBlanc was a NOPD detective.

### Testimony of Detective Kevin Bell

Detective Kevin Bell testified that he partnered with Sergeant, then detective, LeBlanc and corroborated Sergeant LeBlanc's account of the events.

### Testimony of Don Hancock

Don Hancock, a telecommunications telephone supervisor for the Orleans Parish Sheriff's Office, testified that he receives requests from different agencies to turn over recorded inmate phone calls and that, in the instant case, the District Attorney's Office asked him to turn over the phone records of Edward in the form of a CD. He stated that the CD contained inmate-identifying information (specifically a PIN[FN2] number) and that the CD offered into evidence at trial matched Edward's phone calls made from prison. Mr. Hancock testified that he listened to the calls and that he was able to verify that it was Edward making them.

[FN2] Personal Identification Number.

Several transcribed phone calls made by Edward appear of record: On 9 April 2008, he and the person on the phone talked about "them" watching and that they were going to tell "them" that he, Edward, was out of town. On 22 April 2008, Edward told the person to whom he spoke that he would most likely be out of jail in sixty days if no witnesses came forward. Talking to his brother, Damian Red, Edward inquired as to whether his brother had spoken to a girl he chose not to name, inferring that he was inquiring about whether the girl was going to reveal information about the shooting. Lastly, on 11 May 2008, in a conversation with his brother Terrance, he indicated that there were "girls" who were willing to sign a paper to indicate that he was not involved.

### Testimony of Tariyon Rose

Tariyon Rose, who initially testified on day two of trial, stated that she and Aaron were friends and that they attended school together. She stated that on 8 December 2007, she lived at 5931 Tullis Drive and that Aaron had spent the night with her the preceding two days. She stated that on that day she went to take a shower while Aaron went outside. As she was getting dressed, she heard banging on the door. She stated that when she opened the door, Aaron was standing there with an injured chin, and he told her that he had been in a fight with two "dudes" because he did not want to share his potato chips. Ms. Rose testified that she and

Aaron walked outside so that Aaron could show her with whom he had fought. According to Ms. Rose, Aaron pointed out "Terrance and a boy James." She explained that she proceeded to walk to the store after Aaron pointed out the two people he had fought with, and Edward walked past her dressed entirely in black with a gun at his side. She said she recognized Edward because she had previously seen him pick up his brother, Terrance, in a car. Ms. Rose testified that upon recognizing Edward she was barely able to turn around when she heard gunshots. She stated that she saw Terrance and Edward running back towards the store. She stated that Kimberly Williams ("Kimberly") had been hit by a bullet and that she was walking with the assistance of two other girls.

### Testimony of Officer Robert Dees

Officer Robert Dees testified that he was lying in his bed after work on 8 December 2007 when he thought he heard gunshots. After observing from his window vehicles stopped on Tullis Drive, he grabbed his police radio and duty weapon, exited his house, and observed people running from the side of "Julien's," the corner store. Officer Dees stated that he called NOPD dispatch and gave descriptions of the vehicles and the people he saw running. Although he was able to identify one vehicle, he was unable to give a description of the individuals he witnessed running, save that they were African-American.

### Testimony of Wanda Nicholls

Wanda Nicholls of Moon's Towing testified that she tows and sells cars and that the vehicle identified by Officer Dees was sold on 4 December 2007 to Edward.

### Testimony of Detective Glenn Washington

Detective Glenn Washington testified that he was assigned to the NOPD Fourth District Task Force on 8 December 2007. He and his partner, Detective Wesley Humbles, responded to a homicide on Tullis Drive. He stated that he assisted in preserving the crime scene. He testified that he recognized the reference to "T" as being Terrance, and that he later learned that Terrance and James Green were involved in a fight with Aaron. Detective Washington explained that his investigation led him to the home of Freddie Red, Terrance's grandmother, where he, Detective Humbles, and Sergeant Laurent arrested Terrance and James Green.

### Testimony of Detective Anthony Pardo

Detective Anthony Pardo testified that he had been a member of the NOPD for approximately fourteen years and worked for the homicide division for ten of those years. He testified that on 8 December 2007, he learned of a surviving gunshot victim at a shooting on Tullis Drive who had been transported to Tulane Hospital. He went to Tulane Hospital and interviewed Kimberly. He learned that she was sitting outside in the 5900 block of Tullis Drive when she witnessed an altercation between a person she described as "Red" and who Detective Pardo described as the "perpetrator." Kimberly gave a description of the "perpetrator"

and the "perpetrator's little brother" and told Detective Pardo that she was shot along with Aaron. Detective Pardo testified that he turned in all of his investigation material to Detective LeBlanc once he returned to the station.[10]

## **Petitioner's Claims**

## **Brady Claim**

Petitioner's first claim is that the state suppressed material evidence, i.e. a statement by Tariyon Rose to Detective LeBlanc, in violation of Brady v. Maryland, 373 U.S. 83 (1963). On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> Edward asserts in his first assignment of error that the state violated its duty under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to provide him with Tariyon Rose's prior statement to then Detective LeBlanc. He argues that the district court erred in not requiring the state to provide the recorded statement of Ms. Rose's interview by Detective LeBlanc prior to the state resting its case.
>
> According to Edward, Ms. Rose was the only person who testified as to his identity. He argues that a direct contradiction exists between the recorded statement Ms. Rose gave to Detective LeBlanc on the night of the murder and her testimony at trial. Specifically, Edward maintains that the recorded statement indicates that she did not see the shooter before the shooting, hearing only gunshots, but at trial she testified that she saw Edward walk past her with a gun.
>
> Edward maintains that the state violated Brady wherein the Court found that suppression of a confession by a confederate of the defendant was a violation of due process under the Fourteenth Amendment. In support of his argument, he maintains that at least twice during trial he requested that the state provide him with Brady material and that if he would have been privy to Ms. Rose's statement, it might have affected the outcome and/or provided a basis for impeachment. He relies on Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), wherein the Court reversed and remanded Kyles' conviction and sentence for first degree murder after Kyles learned that the state withheld an eyewitness statement, numerous statements by an informant, and a computer printout of cars and license plates. The Court noted that Kyles' car was not at the scene, and, citing United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), concluded that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433-434, 115 S.Ct. 1555.
>
> Further, Edward argues that he was not allowed to read from Ms. Rose's prior statement in an effort to impeach her and that the district court only allowed

---

[10] State v. Augustine, 133 So.3d 148, 151-53 (La. App. 4th Cir. 2014); State Rec., Vol. 9 of 10.

him three minutes to call a witness to impeach Ms. Rose, but he was unable to produce the witness in the time allowed. Additionally, he maintains that the state knew of Ms. Rose's statement a week prior to trial, that the record supports this contention, and that since his Sixth Amendment right to confrontation was violated, he is entitled to a new trial.

Contrariwise, the state maintains that Edward's scenario is exactly the scenario in State v. Smith, 430 So.2d 31, 42 (La. 1983), wherein the Court stated:

> The case at bar, however, is distinguishable from Brady, for we do not have a situation where withheld information was discovered only after conviction, but one where the exculpatory evidence became available to the defense during trial. See United States v. Kaplan, 554 F.2d 577 (3rd Cir. 1977). Not all cases involving late disclosure of exculpatory evidence result in reversible error. We must determine whether the late disclosure so prejudiced the defendant that he was denied his constitutional right to a fair trial. State v. Arnaud, 412 So.2d 1013 (La. 1982); State v. Roussel, 381 So.2d 796 (La. 1980); State v. Manning, 380 So.2d 46 (La. 1980).

The state further argues that it provided Edward with a redacted copy of the full investigation report that included a "synopsis" of Ms. Rose's statement to Detective LeBlanc. According to the state, it had no duty to provide Edward with a copy of Ms. Rose's statement until her testimony revealed inconsistencies with the recorded statement. The state argues that it provided Edward with a copy of the statement at the end of its case and that Edward did not proceed as he could have in order to impeach Ms. Rose. The state further maintains that prior to Edward resting his case he could have called Ms. Rose or Sergeant LeBlanc to the stand. Finally, the state argues that Edward erred in waiting to reference Ms. Rose's statement during closing arguments instead of at an earlier point during trial.

The state contends that more importantly, its star witness was Edward himself. According to the state, the jury heard tapes of Edward stating that he was expecting to be released from jail by inferring that the female witness (Ms. Rose) would likely not cooperate; that he made up a false alibi; and that he would pay someone for a phony affidavit. Therefore, the state argues that even if Edward was able to impeach Ms. Rose, the outcome would be the same because the tapes heard by the jury of Edward's account of the event far outweigh a statement made by Ms. Rose, who was most likely reluctant to be a witness.

The inquiry here is whether Edward was entitled to this evidence. If he was not, the state was under no obligation to provide it. If this evidence is found to be discoverable, the question then becomes whether the facts and circumstances of the state's actions or omissions indicate improper intent on their part.

We first look to a timeline of what happened and when it happened in the trial. The record before us reveals the following:

At trial, the state called Sergeant LeBlanc on day two of trial before calling Ms. Rose as a witness. During the redirect examination of Sergeant LeBlanc, the state moved to introduce in evidence "for record purposes only" a transcription of the statement Sergeant LeBlanc took from Ms. Rose. Without requesting to see the statement or ever having reviewed it, Edward's counsel objected to its admission on the grounds that the statement was hearsay. The trial court sustained the objection. Edward's counsel then proceeded to re-cross examine Sergeant LeBlanc. Though he was then aware of the statement Ms. Rose gave to Sergeant LeBlanc and the statement was available to him, Edward's counsel did not use the statement in his re-cross examination of Sergeant LeBlanc.

On day three of trial, Sergeant LeBlanc was recalled by the state to again testify. On direct examination, he stated that on the day of the shooting, Terrance wore a dreadlocked hairstyle. On cross-examination, Edward's counsel questioned him at length concerning "things that Tariyon Rose told [him]," and regarding his written summary of what she told him as related in the police report he prepared of the incident. Though available prior to his cross-examination of Sergeant LeBlanc, the record does not reflect that Edward's counsel at trial either requested a copy of the transcript of Ms. Rose's recorded statement that the state had sought to admit into evidence the previous day, or that Edward's counsel reviewed the transcript of her statement at the time of his first cross-examination of Sergeant LeBlanc on the second day of trial.

The state initially called Ms. Rose to testify on day two of trial. Her testimony followed that of Sergeant LeBlanc and occurred subsequent to the state's attempt to enter in evidence a transcript of the recorded statement she gave to Sergeant LeBlanc. Though available to him, Edward's counsel did not refer to her prior statement in his cross-examination of Ms. Rose at trial on day two.[FN3]

> [FN3]  A summary of Ms. Rose's testimony given on day two is provided *supra*.

Ms. Rose was recalled by the state to testify on day three of trial. On direct examination, she stated that, as she walked to the store, Edward passed her, moving in the opposite direction towards the scene where the fight occurred. He was wearing a black long-sleeved shirt and black pants. At that time, he had a gun at his side in the waistband area. She testified that as she heard gunshots, she turned around and saw Edward running from the scene with the gun then in his hand and Terrance running behind him. Ms. Rose testified that she met with Detective LeBlanc at the district station and described the person she saw running from the scene with the gun in his hand as "Tee's brother," but stated that she didn't know him. She had seen him once before when he came to pick up Terrance from her house.

Edward's counsel then cross-examined Ms. Rose. Again, though available to him since the previous day, the record does not reflect that Edward's counsel

requested a copy of the transcript of Ms. Rose's recorded statement or that he reviewed it prior to his cross-examination of her on day three of trial.

This court has set forth the <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), review as follows:

> Due process requires the disclosure of evidence that is both favorable to the accused and material either to guilt or punishment. <u>Brady v. Maryland</u>, 373 U.S. at 87, 83 S.Ct. at 1197-97. The <u>Brady</u> rule also requires the disclosure of evidence adversely affecting the credibility of government witnesses. <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). When such information is not disclosed and it is material in that its suppression undermines the confidence in the outcome of the trial, then constitutional error occurs and the conviction must be reversed. <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. <u>Id</u>. Materiality hinges on "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Further, the defendant must show that "'disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.'" <u>State v. Marshall</u>, 81-3115, 94-0461 (La. 9/5/95), 660 So.2d 819, 826 (quoting <u>Kyles</u>, 514 U.S. at 441, 115 S.Ct. at 1569).

<u>State v. Hollins</u>, 11-1435, p. 23 (La.App. 4 Cir. 8/29/13), 123 So.3d 840, 858.

As previously noted, the record reflects that the state sought to introduce Ms. Rose's statement on day two of trial during its re-direct examination of Sergeant LeBlanc, to which Edward objected on the grounds of hearsay. The trial testimony on day two of trial at the close of the state's re-direct examination of Sergeant LeBlanc was as follows:

> MS. BERTHELOT:
> Your Honor, the State would also move to introduce Tariyon's statement, as it was gone into extensively by the Defense.

> MR. GREEN:
> Your Honor, obviously we would object. It's hearsay. It wasn't gone into by the Defense because we've never seen it.

> THE COURT:

Sustained.  I am sorry, what is this person's name?  Say it again for the record, please.

MS. BERTHELOT:
Tariyon Rose.

THE COURT:
Spell Tariyon.

MS. BERTHELOT:
T–A–R–I–Y–O–N.

THE COURT:
And what's the last name?

MS. BERTHELOT:
Rose.

THE COURT:
Any questions for Detective Leblanc [sic]?

MS. BERTHELOT:
Thank you, Sergeant, no further questions.

MR. GREEN:
Your Honor, may I just have one or two questions on re-cross?

THE COURT:
Will it prevent you from having to re-call Detective LeBlanc in the Defense's case?

MR. GREEN:
Yes, Your Honor.

It does not appear from the record that Edward requested a copy of the statement or reviewed it prior to lodging his hearsay objection, which the court sustained.  Ms. Rose first testified on day two of trial after the state moved to introduce her statement into evidence.  Thus, according to the record, Edward had access to Ms. Rose's statement for review and impeachment purposes prior to his initial cross-examination of her on day two of trial, as well as prior to his re-cross examination of her on day three of trial.  Moreover, the record confirms that the statement was also available to Edward's counsel prior to his re-cross examination of Sergeant LeBlanc on day three of trial.  That Edward did not request a copy of

Ms. Rose's statement from the state until day three of trial following the testimony of these two witnesses does not mean that it was not available to him for cross-examination or impeachment purposes as he claims, for the record clearly indicates that it was.  On the last day of trial, the court instructed the state to submit the statement to Edward, but also instructed that he was required to follow the rules of impeachment.  Because the statement was available to Edward prior to his re-cross examination of Sergeant LeBlanc and prior to both his initial and his re-cross examination of Ms. Rose, we do not find that the state withheld evidence or that a <u>Brady</u> violation has occurred.

Even if we were to conclude that the statement had not been properly turned over by the state to Edward, "[t]he information allegedly withheld by the State must be 'material' to the defendant's guilt or innocence to constitute <u>Brady</u> evidence. That is, there must be a reasonable probability that, had the evidence been disclosed, there would be a difference in the outcome."  <u>State v. Hawkins</u>, 90-1235, p. 6 (La.App. 4 Cir. 9/15/95), 667 So.2d 1070, 1076.  Here, we find that Ms. Rose's statement to Detective LeBlanc was not so material that Edward or his counsel having it in advance of trial would have changed the outcome of the case.

The record contains Ms. Rose's statement to Detective LeBlanc.  Ms. Rose states that she clearly saw the gunman, was able to describe him, and indicated that she could identify the gunman if a picture was shown to her.  Edward fails to point to major inconsistencies or exculpatory evidence in Ms. Rose's statement.  Further, in both her statement and her testimony, she stated that she did see the gunman. Therefore, Edward does not demonstrate that he was deprived of any exculpatory material under <u>Brady</u>.  It is likely that the district court found that the statement was cumulative of the testimony elicited at trial.  As such, even had he reviewed it when it became available, the statement does not contain any additional information that would have aided Edward's cross-examination of Detective LeBlanc or Ms. Rose. Edward has not shown how having Ms. Rose's statement prior to trial would have affected the outcome of the trial.  Neither was the defense prejudiced by the failure of the state to disclose the statements prior to trial.

Furthermore, the statement was eventually given to Edward after he objected to its admission initially and he failed to use it to impeach Ms. Rose or Detective LeBlanc.

We find no <u>Brady</u> violation by the state.  Further, the failure of Edward or his counsel to review the transcript of Ms. Rose's statement when it was first offered as evidence by the state following Sergeant LeBlanc's initial appearance as a witness falls within the ambit of trial strategy.  The trial court did not err in refusing to grant a mistrial regarding the statement.  The assignment of error is without merit.[11]

---

[11] <u>State v. Augustine</u>, 133 So.3d 148, 154-58 (La. App. 4th Cir. 2014); State Rec., Vol. 9 of 10.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[12]

The AEDPA places severe limitations on this Court's review of the state court's decision rejecting petitioner's <u>Brady</u> claim.  The United States Fifth Circuit Court of Appeals has explained:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a <u>Brady</u> violation.  <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."); <u>Neal v. Puckett</u>, 286 F.3d 230, 236 (5th Cir. 2002) (*en banc*) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect.").  Rather, [a federal court] decide[s] whether the state court's <u>Brady</u> determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law.  <u>Busby v. Dretke</u>, 359 F.3d 708, 717 (5th Cir. 2004).

<u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006).

As noted, in the last reasoned state court opinion addressing petitioner's claim, the Louisiana Fourth Circuit Court of Appeal cited <u>Brady</u> and analyzed its application to petitioner's claim.  Because the court correctly identified the clearly established federal law governing petitioner's claim, and because he has not pointed to (and the undersigned's research has not found) a United States Supreme Court case with materially indistinguishable facts reaching a contrary result, this Court need only determine whether the state court's application of <u>Brady</u> was "unreasonable."  For the following reasons, the undersigned concludes that it was not.

In his claim in his federal application, the majority of petitioner's argument is devoted to whether Rose's statement to LeBlanc was "material."  However, as the state court correctly noted, materiality is only one prong of the <u>Brady</u> analysis, and a showing of materiality would not alone

---

[12] <u>State v. Augustine</u>, 149 So.3d 260 (La. 2014); State Rec., Vol. 9 of 10.

suffice to establish a <u>Brady</u> claim.  Rather, he must also show that the evidence in question was "suppressed."  It is on that prong of the analysis that petitioner's claim most clearly falters.

As noted, the state court found that Rose's statement was not "suppressed" in the instant case.  Specifically, the state court found that Rose's statement was revealed and made available to defense counsel before Rose ever testified.  If he desired, defense counsel had ample time to obtain the statement, review it, and use it to impeach her testimony in the manner petitioner now suggests (i.e. on the fact that the statement contradicts her trial testimony that she saw petitioner with a gun immediately *before* the murder).[13]  The state court's finding that the statement cannot be considered "suppressed" under those facts is not an unreasonable application of clearly established federal law as set forth by the United States Supreme Court.

On the contrary, the United States Fifth Circuit Court of Appeals has noted that "[t]he Supreme Court has *never* expressly held that evidence that is turned over to the defense *during trial* has been 'suppressed' within the meaning of <u>Brady</u>."  <u>Powell v. Quarterman</u>, 536 F.3d 325, 335 (5th Cir. 2008) (emphasis added).  The Fifth Circuit went on to note:

> Our court has held that such evidence is not considered to have been suppressed.  <u>See</u> <u>United States v. Williams</u>, 132 F.3d 1055, 1060 (5th Cir. 1998); <u>see also</u> <u>Lawrence v. Lensing</u>, 42 F.3d 255, 257 (5th Cir. 1994); <u>United States v. McKinney</u>, 758 F.2d 1036, 1049-50 (5th Cir. 1985).  In this Circuit, when the claim is untimely disclosure of <u>Brady</u> material, we have looked "to whether [the defendant] was prejudiced by the tardy disclosure."  <u>Williams</u>, 132 F.3d at 1060.  We have held that a defendant is not prejudiced if the evidence is received in time for its effective use at trial.  <u>United States v. Walters</u>, 351 F.3d 159, 169 (5th Cir. 2003) (collecting cases).

---

[13] That defense counsel ultimately opted not to try to impeach Rose based her prior statement is of no consequence for the purposes of petitioner's <u>Brady</u> claim.  The simple fact is that defense *could* have done so, despite the fact that he, for whatever reason, did not.

Powell, 536 F.3d at 335.  Accord United States v. Williams, 132 F.3d 1055, 1060 (5th Cir. 1998) ("To establish a Brady violation, the defendant must show that the prosecution suppressed material evidence favorable to the accused.  Because the government produced the allegedly inconsistent statement during the trial, the evidence was not suppressed." (citation omitted)); United States v. Higgs, 713 F.2d 39, 44 (3rd Cir. 1983) ("The Brady material in this case was information that appellees could use on cross-examination to challenge the credibility of government witnesses. For that type of material, we think appellees' right to a fair trial will be fully protected if disclosure is made the day that the witness testifies.  Disclosure at that time will fully allow appellees to effectively use that information to challenge the veracity of the government's witnesses. … Thus we hold that, assuming the requested information is Brady material, appellees' due process rights to a fair trial would be satisfied in this case as long as disclosure is made the day that the government witnesses are scheduled to testify in court.").[14]

Therefore, for all of these reasons, it is clear that petitioner has failed to demonstrate that the state court's decision denying his Brady claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Accordingly, this Court should defer to the state court's decision and likewise deny the claim.[15]

---

[14] Because the statement was not "suppressed," this Court need not reach the issue of whether the statement was "material."  See, e.g., United States v. Graham, 484 F.3d 413, 418 (6th Cir. 2007) ("Because the evidence upon which Graham bases his Brady claim was not suppressed by the Government, we need not reach the materiality prong of the Brady analysis.").

[15] Out of an abundance of caution, the undersigned further notes that this Court need not reach the related issue of whether the prosecution violated its discovery obligations under state law because, without more, such discovery violations cannot serve a basis for federal relief.  Simply put, there is no general federal constitutional right to discovery in a criminal case, and, therefore, a claim that a prosecutor violated state discovery rules is not cognizable on federal habeas review.  Weatherford v. Bursey, 429 U.S. 545, 559 (1977); Lorraine v. Coyle, 291 F.3d 416, 441 (6th Cir. 2002); Lande v. Cooper, Civ. Action No. 11-3130, 2013 WL 5781691, at *16 (E.D. La. Oct. 25, 2013); Smith

## Hearsay Claim

Petitioner's second claim is that his rights under the federal Confrontation Clause were violated by the admission of hearsay testimony at trial.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> In his second assignment of error, Edward asserts that the trial court erred by repeatedly allowing hearsay testimony.
>
> According to Edward, the district court allowed an abundance of hearsay testimony.  Specifically, he maintains that Detective Pardo, who interviewed Kimberly in the hospital on the day of the incident, was allowed to testify as to what he learned from her.  Detective Pardo testified that Kimberly saw Aaron in an altercation, and that she was able to describe the shooter and distinguish the shooter from the shooter's brother.  According to Edward, he was convicted on the attempted murder charge of Kimberly by Detective Pardo's hearsay testimony.
>
> Also, Edward maintains that Detective LeBlanc was also allowed to testify as to what he learned.  The detective testified that he learned that Terrance was involved in an altercation and that the possible shooter was referred to as D-Murder, whose name was Damian Red.  Further, Edward maintains that only through the inadmissible hearsay of Ms. Rose was it revealed that "Kenny" (Ms. Rose's brother) allegedly told her that Edward's family offered her money not to testify.
>
> Edward argues that he objected to the hearsay testimony numerous times throughout the trial and that the district court allowed witnesses to rephrase their responses from what they were "told" by an individual to what they "learned" from an individual.
>
> Edward relies on State v. Broadway, 96-2659 (La. 10/19/99), 753 So.2d 801, wherein the defendant, who was found guilty of first degree murder and sentenced to death, argued on appeal that the hearsay testimony of the officers as to the two eyewitnesses who identified the defendant should not have been admissible.  The Court reasoned, and Edward cites:
>
>> Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in "drawing the full picture" for the jury.  However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant's guilt that would otherwise be barred by the hearsay rule.  State v. Wille, 559 So.2d 1321, 1331

v. Travis, Civ. Action No. 08-4627, 2009 WL 1704335, at * 10 (E.D. La. June 16, 2009); Burns v. Lafler, 328 F. Supp. 2d 711, 723 (E.D. Mich. 2004).

(La. 1990); <u>State v. Hearold</u>, 603 So.2d 731, 737 (La. 1992).  As this Court emphasized in <u>Hearold</u>, 603 So.2d at 737,

> Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted under an "explanation" exception.  The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted.

<u>Id</u>., pp. 8-9, 753 So.2d at 809.

Thus, Edward maintains that the hearsay evidence was not harmless error because it is possible that the jury relied on the evidence to determine that he murdered Aaron and attempted to murder Kimberly, and because of that, he was not afforded a fair trial.

The state contends, however, that the evidence presented at trial was "merely cumulative, corroborative, or exculpatory" to other evidence adduced.  It maintains that Detective Pardo testified that Kimberly identified someone other than Edward as the shooter, and therefore, there was no way the evidence could have been prejudicial.  Further, the state contends that Detective LeBlanc's testimony was merely a corroboration of the testimony of Charlene Smith, Tariyon Rose, and Dale Smith.  Finally, the state maintains that Ms. Rose's testimony about being offered compensation by her brother, Kenny, is corroborative to what the jury heard on the taped discussions of Edward wanting to discourage witnesses from testifying.

The statements made by Detective Pardo, Detective LeBlanc, and Ms. Rose are hearsay.  La. C.E. art. 801.  Therefore, the issue is whether admitting the hearsay testimony was harmless.  La.C.Cr.P. art. 921.

La. C.E. art. 801 A(1) and C define hearsay as an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.  Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation.  La. C.E. art. 802.

The Sixth Amendment's confrontation clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  In <u>Crawford v. Washington</u>, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court found that certain ex parte examinations, while admissible under modern hearsay rules, are exactly the kind of testimonial evidence against the accused that the confrontation clause is supposed to prevent:  that is, testimonial evidence in the form of an out-of-court declaration to establish or prove a fact.  The Court found that under the Sixth Amendment a necessary condition for the admissibility of the testimonial

statements against an accused in a criminal case is the prior opportunity to confront the unavailable witness.

Nonetheless, in light of Crawford, both Detective Pardo's and Detective LeBlanc's statements were testimonial. "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." Crawford, 541 U.S. at 52, 124 S.Ct. 1354.

"If hearsay evidence has been improperly admitted, the trial court's error is subject to a harmless error standard of review. The error is harmless when the appellate court finds that, in light of the evidence proving the defendant's guilt, the verdict rendered was surely unattributable to the error." State v. Smith, 11-0091, pp. 18-19 (La.App. 4 Cir. 7/11/12), 96 So.3d 678, 690 (citing State v. Snyder, 98-1078 (La. 4/14/99), 750 So.2d 832, 845).

The record demonstrates that Detective Pardo testified as to his own observations during his investigation. The testimony was offered in an attempt to explain the course of the investigation leading to the arrest of Edward. Edward was given the opportunity to cross-examine Detective Pardo regarding his observations, and he could have highlighted any weaknesses in Detective Pardo's testimony. "Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in drawing the full picture for the jury." Broadway, 96-2659, p. 8, 753 So.2d at 809. In Broadway, the Court affirmed the defendant's conviction and sentence after a police officer's testimony of the statements that a "co-participant" aided in the defendant's murder conviction. The Court concluded that the reference to the "co-participant's" statements was harmless error. Id., pp. 23-25, 753 So.2d at 817-818.

Although Detective Pardo's testimony violated the standards set out in Crawford, the violation was harmless in the context of this case. Kimberly was shot at the same time as Aaron. Ms. Rose identified Edward as the shooter and Ms. Williams identified Damian Red as the shooter. Edward was not prejudiced by these statements. Kimberly did not take the stand at trial; thus, Detective Pardo offered testimony as to what he learned about Kimberly during his investigation of the murder. "In certain circumstances, the testimony of a police officer may encompass information provided by another individual without constituting hearsay if offered to explain the course of the police investigation and the steps leading to the defendant's arrest." State v. Cyrus, 11-1175, pp. 20-21 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565-566, citing State v. Smith, 400 So.2d 587, 591 (La. 1981). We find Detective LeBlanc's testimony was harmless because it was cumulative to testimony from other witnesses. "[T]he introduction of statements complained of as hearsay which are merely corroborative and cumulative of other testimony presented by the state is harmless error." State v. Hawkins, 90-1235, p. 14 (La.App. 4 Cir. 9/15/95), 667 So.2d 1070, 1080 (citing State v. Hall, 624 So.2d 927, 930 (La.App. 2d Cir. 1993) and State v. Franklin, 520 So.2d 1047, 1053 (La.App. 3rd Cir. 1987)).

As to Edward's argument concerning Ms. Rose's statement that she was told she would receive money in lieu of testifying, we do not find a violation of <u>Crawford</u>; the statement was not testimonial in a manner that would violate <u>Crawford</u>.  In addition, it does not fit within a hearsay exception.  However, the hearsay testimony was harmless.  Her statement was cumulative to Edward's recorded calls submitted into evidence.  Therefore, the admission of Ms. Rose's testimony as to what her brother Kenny said is harmless error.

The assignment of error lacks merit.[16]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[17]

Once again, the state court correctly identified the controlling clearly established federal law, i.e. <u>Crawford</u>.  In <u>Crawford</u>, the United States Supreme Court observed:  "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'  We have held that this bedrock procedural guarantee applies to both federal and state prosecutions."  <u>Crawford</u>, 541 U.S. at 42.  The Supreme Court then went on to note that although the Confrontation Clause can overlap with state laws concerning hearsay, it actually addresses separate and distinct concerns:

[N]ot all hearsay implicates the Sixth Amendment's core concerns.  An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted.  On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.

The text of the Confrontation Clause reflects this focus.  It applies to "witnesses" against the accused – in other words, those who "bear testimony."  2 N. Webster, An American Dictionary of the English Language (1828).  "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."  <u>Ibid</u>.  An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.  The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

---

[16] <u>State v. Augustine</u>, 133 So.3d 148, 158-61 (La. App. 4th Cir. 2014); State Rec., Vol. 9 of 10.
[17] <u>State v. Augustine</u>, 149 So.3d 260 (La. 2014); State Rec., Vol. 9 of 10.

Crawford, 541 U.S. at 51; accord Davis v. Washington, 547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").

Here, the state court found that Rose's testimony concerning what she was told by "Kenny," although hearsay, did not implicate the Confrontation Clause.  That finding was not an unreasonable application of clearly established federal law.  On the contrary, it is clear that statements made by private individuals to one another in informal conversations outside of a trial context are not made for the primary purpose of aiding in a criminal investigation and, therefore, simply are not "testimonial" in nature for purposes of the Confrontation Clause.  See, e.g., United States v. Ramirez, 658 Fed. App'x 949, 954 (11th Cir. 2016); United States v. Pugh, 273 Fed. App'x 449, 454-55 (6th Cir. 2008); United States v. Brown, 441 F.3d 1330, 1360 (11th Cir. 2006); Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004).

That said, the state court further found that the statements related by Detectives Pardo and LeBlanc, which they obtained in the course of their investigation, *were* "testimonial" and, therefore, *did* run afoul of the Confrontation Clause.  However, the state court nevertheless found relief was not warranted because the Confrontation Clause violations were ultimately harmless. For the following reasons, this Court should likewise defer to that decision.

Clearly, "Confrontation Clause violations are subject to harmless error analysis." Fratta v. Quarterman, 536 F.3d 485, 507 (5th Cir. 2008).  However, as the United States Supreme Court has explained:

> The test for whether a federal constitutional error was harmless depends on the procedural posture of the case.  On *direct appeal*, the harmlessness standard is the one prescribed in Chapman [v. California], 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 [(1967)]: "[B]efore a federal constitutional error can be held harmless,

the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id., at 24, 87 S.Ct. 824.

In a *collateral proceeding*, the test is different. For reasons of finality, comity, and federalism, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht [v. Abrahamson], 507 U.S. [619,] 637, 113 S.Ct. 1710[, 123 L.Ed.2d 353 (1993)] (quoting United States v. Lane, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). There must be more than a "reasonable possibility" that the error was harmful. Brecht, *supra*, at 637, 113 S.Ct. 1710 (internal quotation marks omitted). The Brecht standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." Calderon v. Coleman, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (*per curiam*).

Davis v. Ayala, 135 S.Ct. 2187, 2197-98 (2015) (emphasis added).[18]

Accordingly, where, as here, a state court has found a constitutional error harmless on *direct review* but the federal court is tasked with reviewing that decision on *collateral review*, the United States Supreme Court has explained:

Because [the federal petitioner] seeks federal habeas corpus relief, he must meet the Brecht standard, but that does not mean … that a state court's harmlessness determination has no significance under Brecht. In Fry v. Pliler, 551 U.S. 112, 120, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007), we held that the Brecht standard "subsumes" the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under Chapman. The Fry Court did not hold – and would have had no possible basis for holding – that Brecht somehow abrogates the limitation on federal habeas relief that § 2254(d) plainly sets out. While a federal habeas court need not "formal[ly]" apply both Brecht and "AEDPA/Chapman," AEDPA nevertheless "sets forth a precondition to the grant of habeas relief." Fry, *supra*, at 119-120, 127 S.Ct. 2321.

---

[18] Out of an abundance of caution, the undersigned notes that the state court did not cite Chapman or the definition of harmless error as an error "harmless beyond a reasonable doubt." Instead, the state court cited to a state court decision, State v. Smith, 96 So.3d 678, 690 (La. App. 4th Cir. 2012), which holds that that an error is harmless when "the verdict rendered was surely unattributable to the error." Although worded slightly differently, that standard is in fact derived from and simply a restatement of the Chapman standard. See Sullivan v. Louisiana, 508 U.S. 275, 279 (1993).

<u>Davis</u>, 135 S. Ct. at 2198.  The Supreme Court then went on to explain that because a state court's determination that a constitutional error was harmless on direct review constitutes an adjudication of the constitutional claim "on the merits," then the deferential standards of review set forth in 28 U.S.C. § 2254(d) necessarily apply.  Therefore:

> When [the state court's] <u>Chapman</u> decision is reviewed under AEDPA, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." <u>Fry</u>, *supra*, at 119, 127 S.Ct. 2321 (emphasis in original).  And a state-court decision is not unreasonable if "'fairminded jurists could disagree' on [its] correctness."  [<u>Harrington v.</u>] <u>Richter</u>, [562 U.S. 86,] 101, 131 S.Ct. 770[, 178 L.Ed.2d 624 (2011)] (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). [The petitioner] therefore must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  562 U.S., at 103, 131 S.Ct. 770.
>
> In sum, a prisoner who seeks federal habeas corpus relief must satisfy <u>Brecht</u>, and if the state court adjudicated his claim on the merits, the <u>Brecht</u> test subsumes the limitations imposed by AEDPA. <u>Fry</u>, *supra*, at 119-120, 127 S.Ct. 2321.

<u>Davis</u>, 135 S.Ct. at 2199.

Here, the state court found that the challenged statements by Detectives Pardo and LeBlanc were harmless because they were cumulative of other testimony adduced at trial from other witnesses.  That decision is not an unreasonable application of clearly established federal law.  <u>See, e.g.</u>, <u>United States v. Sanchez-Alaniz</u>, 517 Fed. App'x 277, 278 (5th Cir. 2013) ("The improper admission of cumulative evidence is harmless error."); <u>United States v. Tolliver</u>, 400 Fed. App'x 823, 830 (5th Cir. 2010) ("Improper admission under <u>Crawford</u> is harmless when there is no reasonable probability that the improperly admitted evidence might have contributed to the conviction, for instance, when the evidence is merely cumulative of other evidence offered without objection." (citations and quotation marks omitted)); <u>United States v. Yi</u>, 460 F.3d 623, 634-35

(5th Cir. 2006) (Confrontation Clause error was harmless where testimony regarding out-of-court statements "was not particularly important to the government's case, was cumulative to other evidence, and was corroborated by other evidence."). Therefore, this Court should defer to the state court's decision denying petitioner's Confrontation Clause claim.

Lastly, to the extent that petitioner is also asserting a claim based on state hearsay law separate and distinct from his federal Confrontation Clause claim, that claim likewise fails. The United States Fifth Circuit Court of Appeals has held:

> In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law. However, a state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness. Thus, only when the wrongfully admitted evidence has *played a crucial, critical, and highly significant role in the trial* will habeas relief be warranted.

Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998) (citations omitted; emphasis added); see also Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) ("The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.").

Here, it cannot reasonably be argued that admission of the hearsay statements at issue was an error so extreme as to render petitioner's trial fundamentally unfair. For the reasons noted by the state court, those hearsay statements simply cannot be said to have played a crucial, critical, and highly significant role in his convictions. Rather, even aside from that hearsay evidence, there was compelling evidence of his guilt of the instant offenses, including the compelling eyewitness testimony of Tariyon Rose, which the jury obviously found credible.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Edward Augustine be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[19]

New Orleans, Louisiana, this seventh day of March, 2017.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[19] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

26